**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0654n.06

Nos. 08-5677, 08-5678

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Oct 19, 2010**

LEONARD GREEN, Clerk

No. 08-5677

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIE A. FREEMAN, No. 08-5677 | ) | |
| MARION RUSSELL, No. 08-5678 | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:  NORRIS, ROGERS, and WHITE, Circuit Judges.

**ROGERS, Circuit Judge.**  In February 2008, co-defendants Willie A. Freeman and Marion Russell were each convicted by a federal jury of possession with the intent to distribute more than five grams, but less than fifty grams, of cocaine base; simple possession of a quantity of cocaine; and possession with the intent to distribute 369 dosage units of MDMA.  Local law enforcement officers had discovered $20,000 worth of drugs hidden in the defendants' rental car during a routine traffic stop in eastern Tennessee in January 2007.  On appeal, Freeman and Russell contend that authorities violated their Fourth Amendment rights during the traffic stop, and that evidence of an incident in July 2006, when the defendants reported the theft of more than $14,000 in cash from their Johnson City, Tennessee, hotel room, should not have been admitted to prove their intent to distribute narcotics.  In addition, Freeman argues that evidence of his eleven-year-old drug-trafficking

conviction was improperly admitted to prove his intent and to impeach his trial testimony. Russell, moreover, challenges the sufficiency of the evidence to sustain his convictions.

Because the authorities developed reasonable suspicion to detain the defendants during the January 2007 traffic stop; because evidence of the July 2006 incident is probative of the defendants' intent, and they have not explained how that evidence was unfairly prejudicial to them; and because the Government presented sufficient evidence to support a finding that Russell had constructively possessed the narcotics, we affirm Russell's convictions. However, because the probative value—if any—of Freeman's prior conviction was substantially outweighed by a risk of unfair prejudice, and because the admission of that prior conviction into evidence was not harmless, we reverse Freeman's convictions and remand for a new trial.

## I.

This drug-trafficking case originated with the January 17, 2007, traffic stop of Willie A. Freeman's rental car, in which Marion Russell was a passenger. After law enforcement officers discovered cocaine base, cocaine, and MDMA dosage units concealed by the rental car's headliner, a federal grand jury indicted Freeman and Russell on three counts each of possession with the intent to distribute a controlled substance.

Freeman moved to suppress evidence of the narcotics that the Government had seized from his rental car, asserting that the officer who had stopped the car, allegedly for speeding, had detained Freeman and Russell for longer than necessary to effectuate the purposes of the stop. Russell subsequently joined in Freeman's motion, which the Government opposed.

At a suppression hearing before a magistrate judge, Freeman moved into evidence a videotape of the events of January 17, 2007, as recorded by Tennessee Highway Patrol Trooper Joe Lunceford's dashboard-mounted camera. Trooper Lunceford testified for the Government that, on the afternoon of January 17, he had been stationed at the fifty-mile marker on eastbound I-26—approximately five miles from the Tennessee-North Carolina border. On that afternoon, he had clocked a vehicle going 74 miles per hour in a 55-mile-per-hour zone. Trooper Lunceford turned on his emergency equipment, made a U-turn, and drove up behind the vehicle, which had already pulled off the road. He could see two individuals—whom he identified at the suppression hearing as Freeman and Russell—in the vehicle's front seat and, as he approached, he could see that both had put their hands in the air. As Trooper Lunceford approached, moreover, he "noticed an odor of marijuana coming from the vehicle." He asked the driver, Freeman, for a license, registration, and proof of insurance. Trooper Lunceford then returned to his car and called for a Unicoi County canine unit, "[j]ust to verify what [he] had smelled." "Approximately 9, 10 minutes" passed between the initiation of the stop and when the canine unit arrived; during that time, Trooper Lunceford checked Freeman's license and worked on issuing a citation for speeding.

Trooper Lunceford testified that he had not yet finished writing the citation when a canine officer, Stacy Wigand of the Unicoi County Sheriff's Department, had arrived. Trooper Lunceford told Officer Wigand about the marijuana odor and asked Officer Wigand to walk his dog around the vehicle. After the dog had alerted, the officers searched the vehicle and found $1800 in twenty-dollar bills over the driver's side sun visor and a marijuana roach in an empty fruit-juice bottle. Officer Wigand's dog then sniffed the vehicle's interior and alerted on the cash and on the headliner

near the vehicle's rear window. Trooper Lunceford testified that Officer Wigand then discovered bags of what had appeared to be drugs concealed by the vehicle's rear headliner. After the officers found the drugs, Freeman and Russell were placed under arrest.

On cross-examination, Freeman's counsel played the first few minutes of the videotape of the stop and Trooper Lunceford confirmed that he had said "something ain't right" with respect to the rental car paperwork. Although Freeman had signed the paperwork, the rental agreement was in a third party's name. Freeman's counsel then asked whether Trooper Lunceford remembered telling another officer on the scene that "the rental agreement is what really got me"; Trooper Lunceford responded, "I remember smelling the marijuana in the vehicle. I'm very adamant about that." However, Trooper Lunceford had said nothing about marijuana to Freeman or Russell, nor had he mentioned the odor to dispatch. Rather, Trooper Lunceford had first mentioned the odor approximately sixteen minutes after he had initiated the stop. When Freeman's counsel asked Trooper Lunceford whether he remembered saying, approximately one hour into the stop, that "you didn't know what you were smelling, but it didn't smell right," Trooper Lunceford could not remember having made such a statement.

In response to Russell's counsel's questioning, Trooper Lunceford explained that the odor had "made [him] want to call for a dog, [that] it [had] give[n] [him] reason to want to investigate that further." He insisted that he "was already going to call for the dog before [he had] realized" that the rental agreement was in a third party's name; indeed, "the biggest factor" in his decision to call for a dog "was what [he had] smelled in the car."

After counsel had finished, the magistrate judge questioned Trooper Lunceford while reviewing the videotape. This review revealed that Trooper Lunceford had initiated the stop at 2:46 P.M. and had called in the vehicle's tag number and requested a canine unit approximately two minutes later. At around 2:53 P.M., dispatch advised Trooper Lunceford that Freeman's license was valid; roughly two minutes later, Trooper Lunceford learned that there were no outstanding warrants for Freeman's arrest. Trooper Lunceford told the magistrate judge that he had not re-approached the vehicle until after backup had arrived because Freeman and Russell had appeared nervous—it was "not typical" for individuals to put their hands up during a routine traffic stop—and because of the marijuana odor. Backup arrived by 2:58 P.M. and the canine officer arrived shortly thereafter.

The Government also called Officer Wigand, who testified that, after his dog had alerted on the vehicle's exterior, he had searched the vehicle and found the marijuana roach. The dog also alerted inside the vehicle, on the roof near the rear window. Having noticed that the rear headliner was loose, Officer Wigand pulled it down and a bag filled with a white powdery substance hit him in the face. Officer Wigand testified that the officers had also found currency in the vehicle's center console; he did not recall having found the money above the driver's side sun visor.

Freeman called as a witness Lieutenant David Pauley of the Unicoi County Sheriff's Department, who had also responded to Trooper Lunceford's call for assistance. Lieutenant Pauley testified that, when he had approached the vehicle after Freeman and Russell's arrest, he had not smelled marijuana. He explained, though, that "[o]f course, there was several minutes, several other people done been up there, [and] doors had been opened" before he had approached the vehicle.

Following the suppression hearing, the magistrate judge issued a written report recommending the denial of the defendants' motions to suppress. The report notes that

> Lunceford emphatically testified . . . that he smelled the strong odor of marijuana when he walked up to the driver's side of the car. *The resolution of the defendants' motions to suppress depends upon whether Lunceford is believed, i.e., whether he did or did not smell the odor of marijuana when he first walked up to the car.*

The report concludes that Trooper Lunceford's account of events is credible:

> [Trooper Lunceford] unequivocally and emphatically testified under oath before this Court that he did detect the odor of marijuana. There are portions of the tape that suggest that he did not smell marijuana; at various times, he mentioned certain things that caused him to be suspicious of the defendants, and he notably did not mention an odor of marijuana. For example, at 2:58, he talked about the defendants acting nervously, and the peculiarities of the rental agreement, yet he said nothing about smelling marijuana. At 4:24, as events were drawing to a close, Lunceford said that it was the rental agreement that really seized his attention. But on the other hand, he does make sporadic references to having smelled marijuana, and the fact that he requested a K-9 officer almost immediately after the stop tends to corroborate his testimony.
>
> At 2:58, Lunceford said, "they might be totally legit," which arguably suggests he had not smelled marijuana. But at that point all he knew was that he had *smelled* marijuana. If things had never progressed beyond the mere odor, these defendants would have been sent on their way. But the strong odor of marijuana warranted further investigation, and that further investigation consisted of a K-9 officer and a dog sniff, ultimately leading to the discovery of a cache of drugs in the head liner of the car and over a $1000 in currency. . . .
>
> . . . .
>
> Ultimately, the issue is rather straightforward: is Lunceford to be believed, or is he not? The only evidence is Lunceford's testimony and the videotape. Recalling that the standard of proof is a preponderance of the evidence, it preponderates in favor of Lunceford. In short, Lunceford is believed. It follows therefore that the lapse of twenty-three minutes from the traffic stop to the first sniff of the drug dog, and then the lapse of an additional twenty-six minutes for the discovery of the illegal drugs, was not unreasonable under the Fourth Amendment.

Freeman and Russell filed objections to the magistrate judge's report and recommendations, arguing, primarily, that the magistrate judge had erred in finding Trooper Lunceford credible. The district court overruled their objections, adopted and approved the report and recommendations in a short order, and denied the motions to suppress.

Other evidentiary issues arose pretrial. For example, the Government gave notice of its intent to introduce evidence, pursuant to Federal Rule of Evidence 404(b), that, in November 1996, Freeman had pleaded guilty in a Washington County, Tennessee, court to the sale of a schedule II controlled substance. The government planned to introduce this evidence, in part, to prove Freeman's intent to distribute the narcotics found in the rental car. Freeman objected to the Government's proposed use of his prior conviction because of its age, and because, he argued, its probative value was substantially outweighed by a risk of unfair prejudice. Freeman, moreover, sought a ruling as to whether the Government could use his prior conviction to impeach his testimony at trial. The Government related that it did "not intend to use defendant's 1996 conviction during cross-examination unless the defendant testifies inconsistently with his prior conviction."

At a hearing just days before trial, the district court ruled that the Government could introduce Freeman's prior conviction as evidence of his intent to distribute narcotics. The court explained that, because Freeman was charged with specific intent offenses, "the [G]overnment must prove intent" at trial. The court then concluded that, under Sixth Circuit precedent, in particular *United States v. Matthews*, 440 F.3d 818 (6th Cir. 2006), Freeman's prior conviction is probative of his intent. Although the court characterized the age of the prior conviction as "bothersome," the court noted that, under controlling precedent, "there is no absolute maximum number of years that

may separate a prior act and the act charged in the indictment." Accordingly, "the only real question" for the court was whether the probative value of the prior conviction was substantially outweighed by a risk of unfair prejudice. The district court concluded that "the danger of prejudice" could "be limited considerably by a cautionary instruction[,] which the court will give."

As to the use of Freeman's prior conviction to impeach his trial testimony, the district court's consideration of that issue was limited to the following exchange with the Government's attorney:

> **The Court**: . . . [A]s I recall, Ms. Hebets, you filed a pleading in which you said that if the evidence is admissible as part of your case in chief, obviously you wouldn't intend to impeach Mr. Freeman if he testifies if it's already been admitted.
>
> **Ms. Hebets**: Correct.

The court did not otherwise address the use of the prior conviction for impeachment purposes.

At the same pretrial hearing, the district court also heard argument on the Government's notice of its intent to introduce evidence, again pursuant to Rule 404(b), of a July 2006 incident that had involved both Freeman and Russell. The Government's notice indicated that, in July 2006, law enforcement officers had seized $14,430 in cash from Freeman and Russell after a drug dog had alerted on the money. The Government's attorney represented that Freeman and Russell had reported the money stolen from their Johnson City, Tennessee, hotel room, and that authorities had recovered the money from a hotel maid's residence. The Government's attorney further represented that a drug dog had alerted on the defendants' rental car, inside of which authorities had found marijuana residue. Freeman and Russell objected to the use of this evidence because the controlled substance involved—marijuana—was not a substance charged in the instant indictment. The Government's attorney responded that, in January 2007, authorities had found Freeman and Russell

in possession of more than one controlled substance and that, as to the "$14,000 that was seized in July of the previous year, that's an awful lot of marijuana to sell to get that kind of money."

After the pretrial hearing, the district court issued a written order denying the defendants' objections, and ruling that evidence of the $14,430 seized in July 2006 would be admissible to prove the defendants' intent to distribute narcotics. The district court indicated, however, that it did not understand the significance of the fact that, in July 2006, the defendants had been driving a car rented in a third party's name, or the fact that marijuana had somehow been involved in that incident. The district court further indicated that it would "give an appropriate limiting instruction" at trial.

Subsequently, in an apparent attempt to expand the scope of the admissible evidence of the July 2006 incident, the Government proffered the testimony of two law-enforcement officers who had investigated that incident. Following the Government's proffer, the district court ultimately concluded that evidence of the July 2006 incident would be admissible to prove the defendants' intent to distribute narcotics but not to show a plan, scheme, or pattern. The court reasoned that "the events clearly support the inference that there was a drug-trafficking offense going on" in July 2006, and that the Government had presented "a sufficient factual basis for the testimony about the report of the theft and the seizure of the money and the drug dog hit on the money."

At trial, Trooper Lunceford and Officer Wigand provided testimony similar to that given at the earlier suppression hearing.[1] The Government introduced Freeman's prior drug-trafficking

---

[1]Whereas Officer Wigand testified at the suppression hearing that the officers had found cash in the rental car's center console, he testified at trial that they had found cash above the driver's side sun visor. He explained at trial that, after finding the cash above the sun visor, he had moved it to the center console for safekeeping.

conviction, which the district court instructed the jury to consider "only as it relates to the [G]overnment's claim that defendant Freeman intended to distribute drugs on January 17, 2007." As to the July 2006 incident, the Government called Officers Robert McCurry and Robert Edwards of the Johnson City Police Department. Officer McCurry testified that he had responded to a theft call at a Johnson City hotel on the afternoon of July 16, 2006; that a hotel maid had confessed to taking the defendants' money; and that a canine officer had gone to the maid's apartment. Officer Edwards testified that he and his dog had done a consensual search of the apartment; that his dog had alerted on a trash can, where the officers had found some minor drug paraphernalia, and on the corner of a mattress—between the mattress and the box springs—where the officers had found more than $14,000 in cash; and that his dog was trained to alert at the odor of narcotics but not at the mere presence of currency. Officer Edwards further testified that each defendant had claimed half of the recovered sum. The district court instructed the jury that it could consider evidence of the July 2006 incident "only as it relates to the [G]overnment's claim that the defendants intended to distribute narcotic drugs on or about January 17, 2007[,] . . . but not for any other purpose."

The Government read into evidence a stipulation that, during the January 2007 traffic stop, officers had seized 98.8 grams of cocaine base, 21.5 grams of cocaine, and 396 dosage units of MDMA from the defendants' rental car. A Drug Enforcement Administration Task Force Agent conservatively estimated that the street value of those drugs was approximately $20,000.

At the close of the Government's case, Freeman and Russell each moved for a judgment of acquittal. The district court noted that "the proof is less convincing, less overwhelming with respect to Mr. Russell than it is to Mr. Freeman, especially on the issue of whether or not he knowingly

possessed the, the drugs in question here." Nevertheless, the district court denied both motions, finding that the Government had put forth enough evidence to submit the case to the jury.

Each defendant then testified on his own behalf. On the stand, Freeman explained that, in the early morning hours of January 17, 2007, he had driven from Georgia, to Johnson City, Tennessee, to deliver some clothes to Russell, who had recently moved. Freeman and Russell had worked together in the music business for several years; after Freeman got to Johnson City, he and Russell waited to hear about a recording studio session in Greenville, South Carolina. After waiting awhile without hearing anything, Freeman started back toward Georgia. When Russell heard that they could visit the recording studio after all, however, Freeman turned around and headed back toward Johnson City. Freeman rented a hotel room in Johnson City because, by the time they returned from Greenville that night, it would be too late for him to drive home to Georgia. Freeman testified that he had maintained possession of his rental car throughout the day, except for a twenty-five to thirty minute interval when he had allowed Russell to borrow the car. Freeman and Russell were on their way to Greenville when Trooper Lunceford pulled them over. Freeman testified that he had neither put drugs in the rental car nor known that they were there.

Freeman further testified that he had pleaded guilty to an offense in 1996, had served his time, and had "learn[ed] [his] lesson." He explained that the money seized in July 2006 "was like some money we had for investment in our company, money we had from working, just saved up money; all the money we had in the whole wide world period," but that none of it was drug money. On cross-examination, the Government questioned Freeman at length about both his prior conviction

and the July 2006 incident. Freeman's counsel never objected to the Government's lines of questioning.

For his part, Russell testified that, as of January 17, 2007, he had lived in Johnson City for "a week and some days." On the morning of January 17, he met Freeman in the parking lot outside of Russell's girlfriend's house. After Freeman had started back toward Georgia, Russell "called Mr. Freeman and let him know that it was a go for the studio." Russell went with Freeman to a hotel, but while Freeman was renting a room, Russell borrowed the rental car to pick up a notebook and some blank CDs that he had left at his girlfriend's house. While there, Russell asked an acquaintance to take Freeman's car "to go get a bag of marijuana and a couple of beers." Russell testified that he had borrowed the car for twenty to twenty-five minutes total. He and Freeman were on the road for just thirty minutes or so before Trooper Lunceford stopped them for speeding.

At the close of all evidence, the district court gave the parties an opportunity to review the jury instructions and entertained their objections. Most relevant for purposes of this appeal, the district court instructed the jury that

> [y]ou have heard testimony that defendant Willie Freeman was convicted of selling a schedule II drug in the Circuit Court of Washington County, Tennessee[,] on November 27, 1996. You can consider the evidence only as it relates to the [G]overnment's claim that defendant Freeman intended to distribute narcotic drugs on or about January 17, 2007, *or as one way of helping you decide how believable his testimony was.* You must not consider it for any other purpose.

(Emphasis added.) Freeman's counsel objected to this instruction, arguing that the district court had addressed the use of Freeman's prior conviction for impeachment purposes at the pretrial hearing. The court noted that, when the Government was impeaching Freeman with his prior conviction,

Freeman's counsel had "sat there and didn't make any objection." The district court ultimately

denied Freeman's objection, reasoning that "had this matter been contested, I would have found that

the conviction, even though more than ten years old, was more probative than prejudicial, and I

would have admitted it" for impeachment purposes.

The jury found Freeman and Russell each guilty of possession with the intent to distribute

more than five grams, but less than fifty grams, of cocaine base; simple possession of a quantity of

cocaine; and possession with the intent to distribute 369 dosage units of MDMA. Freeman and

Russell now appeal their convictions.

## II.

### A. Stop and Search of the Rental Car.

The district court properly denied Freeman and Russell's motions to suppress because

Trooper Lunceford had probable cause to stop their rental car and then developed the requisite

reasonable suspicion to continue their detention. When Trooper Lunceford stopped the defendants'

vehicle, he had probable cause to believe that they had violated state law: he had clocked Freeman

driving 74 miles per hour in a 55-mile-per-hour zone and Tennessee law prohibits speeding,

*see United States v. Hill*, 195 F.3d 258, 265 (6th Cir. 1999) (citing Tenn. Code Ann. § 55-8-152).

Thus Trooper Lunceford's initial stop of the defendants' vehicle comported with the Fourth

Amendment. *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005).

Freeman and Russell contend, however, that Trooper Lunceford lacked the justification to

detain them any longer than reasonably required to issue a citation for speeding. This contention is

unavailing because the marijuana odor provided reasonable suspicion for Trooper Lunceford to

continue the defendants' detention. "'Once the purposes of the initial traffic stop [are] completed, there is no doubt that the officer [can] not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Bailey*, 302 F.3d 652, 657-58 (6th Cir. 2002) (alteration in original) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). Trooper Lunceford maintained throughout the suppression hearing that he had smelled marijuana when he had first approached the defendants' vehicle. The magistrate judge concluded that Trooper Lunceford was credible and that the marijuana smell had generated reasonable suspicion to justify the defendants' continued detention. *See United States v. Simpson*, 520 F.3d 531, 543 (6th Cir. 2008).

The magistrate judge's credibility determination, which the district court implicitly adopted and approved, is not clearly erroneous. *Bailey*, 302 F.3d at 656 (setting forth the standard of review for factual findings). The magistrate judge observed, in his written report and recommendation, that Trooper Lunceford had "unequivocally and emphatically testified under oath . . . that he did detect the odor of marijuana." "We are generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001). Freeman and Russell maintain, however, that the videotape belies Trooper Lunceford's testimony. They emphasize that Trooper Lunceford (1) said nothing about the odor, either to them or in his initial communications with dispatch; (2) stated that Freeman and Russell "might be totally legit"; (3) made several comments about how nervous the men were and about how "something ain't right" with the rental agreement; and (4) said, after the officers had discovered the drugs, that he "knew [he had] smelled

- 14 -

something." Freeman and Russell also rely heavily upon Trooper Lunceford's statement that "the rental agreement is really what got me." They highlight the fact that none of the other officers testified to having smelled marijuana in the vehicle.

Freeman and Russell's arguments are unpersuasive. The fact that Trooper Lunceford said nothing about the odor does not mean that he did not, in fact, smell marijuana. Even though he did not mention the odor in his initial communications with dispatch, he did call for a drug dog soon after returning to his car, which suggests that he had smelled something. Moreover, Trooper Lunceford's voicing his suspicions with respect to the defendants' nerves and the third-party rental agreement does not mean that he did not also detect marijuana. Nor is this case controlled by the fact that no one else testified to the smell: they were not on the scene when Trooper Lunceford initially approached the rental car.

The defendants' arguments, several of which the magistrate judge explicitly addressed, do not leave one "'with the definite and firm conviction that a mistake has been committed.'" *Simpson*, 520 F.3d at 535 (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). Because the magistrate judge was in the best position to evaluate Trooper Lunceford's credibility, *Hill*, 195 F.3d at 264-65, and because the record provides "no compelling reason to second-guess the magistrate judge's decision," *Peveler*, 269 F.3d at 702, the credibility determination must stand. It follows, then, that once Trooper Lunceford had smelled marijuana, he had reasonable suspicion to continue the defendants' detention. *See Simpson*, 520 F.3d at 543.

At that point, Trooper Lunceford "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

After returning to his car, he asked for a canine officer, who arrived on the scene roughly ten minutes later. Approximately twenty-three minutes after Trooper Lunceford had initiated the stop, the canine officer walked his dog around the rental car. This was not an unreasonable amount of time to detain the defendants in light of Trooper Lunceford's reasonable suspicion that they were or had been engaged in criminal activity. *See Davis*, 430 F.3d at 355 (concluding that taking thirty minutes to locate drug dog was reasonable where officers reasonably suspected narcotics possession). Once the dog had alerted, the officers had probable cause to search the vehicle, because a "positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994); *see Hill*, 195 F.3d at 273.

In sum, Trooper Lunceford had probable cause to stop Freeman and Russell initially for speeding. Once Trooper Lunceford had smelled marijuana, he had reasonable suspicion to justify the defendants' further detention. The drug dog's alert ultimately established probable cause to search the vehicle. Thus the district court properly denied the defendants' motions to suppress.

**B. Admission into Evidence of Freeman's Prior Conviction.**

It was error to admit Freeman's prior drug-trafficking conviction pursuant to Federal Rule of Evidence 404(b). That conviction was neither near in time nor substantially similar to the conduct at issue here, and its probative value, if any, was substantially outweighed by a risk of unfair prejudice. Rule 404(b) provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

A district court considering whether to admit "other acts" evidence pursuant to Rule 404(b) follows a three-step analysis:

> The first step requires the district court to decide whether there is sufficient evidence that the other act in question actually occurred. If so, the district court must decide whether the evidence of the other act is "'probative of a material issue other than character.'" Finally, if the evidence is probative of a material issue other than character, the district court must decide whether the "probative value of the evidence is substantially outweighed by its potential prejudicial effect."

*United States v. Haywood*, 280 F.3d 715, 719-20 (6th Cir. 2002) (citations omitted). Freeman does not challenge the first step in the admissibility analysis—there is no dispute that he was previously convicted of a state drug-trafficking offense. "We review a district court's rulings regarding both the second and third steps of the Rule 404(b) admissibility analysis to determine whether the district court abused its discretion." *Id.* at 720 (citing *United States v. Mack*, 258 F.3d 548, 553 & n. 1 (6th Cir. 2001)); *see also United States v. Allen*, No. 08-6363, 2010 WL 3419506, at *3 (6th Cir. Aug. 13, 2010).

However, Freeman's prior conviction is not probative of a material issue other than character. "Other acts" evidence satisfies this second step in the admissibility analysis where "(1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *Id.* (citing *United States v. Johnson*, 27 F.3d 1186, 1190-91 (6th Cir. 1994)). The Government offered Freeman's prior conviction for an admissible purpose: to prove his intent to distribute the narcotics found in the rental car. Indeed, "Rule 404(b) explicitly includes intent as a proper purpose for which to offer evidence of other acts." *Id.* at 721; *see also United States v. Bell*, 516 F.3d 432, 442 (6th Cir.

2008). Moreover, Freeman's intent is "in issue" because he pleaded not guilty to three counts of possession with the intent to distribute a controlled substance—a specific intent offense—and the Government therefore must prove his intent beyond a reasonable doubt. *See United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994).

In the end, though, Freeman's prior conviction was not probative of his intent to distribute here, even assuming any factual issues to be resolved in favor of admission. "To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *Haywood*, 280 F.3d at 721 (quoting *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)). Our precedent suggests that "[t]here is no absolute maximum number of years that may separate a prior act and the offense charged." *United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir. 1985). However, not only was Freeman's prior conviction more than ten years old at the time of his January 2007 arrest, but the Government also failed to show a substantial similarity between the prior conviction and the conduct at issue here. The only evident similarities between the two are (1) the fact that Freeman, a resident of Georgia, was arrested in eastern Tennessee in both instances, and (2) the fact that the prior conviction involved crack cocaine, which was one of three controlled substances found in the defendants' rental car. There is no additional information in the record as to the circumstances underlying Freeman's earlier conviction.

In *Bell*, facing a factually analogous situation, we concluded that a defendant's four prior drug-trafficking convictions were not probative of his intent to distribute narcotics. 516 F.3d at 444. The government had alleged neither that the prior convictions were "part of the same scheme to

distribute drugs," nor that those prior convictions had involved a modus operandi similar to the charged conduct. *Id.* We therefore concluded that "[s]uch evidence of prior distribution, unconnected to the present charge, is not probative of whether [the defendant] intended to possess and distribute drugs in the instant case." *Id.* Likewise, here, because the Government provided no evidence that Freeman's prior conviction was substantially similar, or in any way related, to the charged conduct, his prior conviction is not probative of his intent to distribute narcotics. Indeed, as we explained in *Bell*, "[t]he only way to reach the conclusion that the person currently has the intent to possess and distribute based solely on evidence of *unrelated* prior convictions for drug distribution is by employing the very kind of reasoning—*i.e.*, once a drug dealer, always a drug dealer—which 404(b) excludes." *Id.* Accordingly, it was an abuse of discretion to find Freeman's prior conviction probative of his intent to distribute narcotics.

This court's decision in *United States v. Matthews*, 440 F.3d 818 (6th Cir. 2006), relied upon by the district court, is distinguishable from the instant case. In *Matthews*, the defendant was convicted of possession with the intent to distribute more than five grams of cocaine base. *Id.* at 820. The defendant had asserted, by way of a defense, that he had picked up a clear plastic bag off the street without knowing that the bag contained crack. *Id.* at 821. Before trial, the government had filed a notice of its intent to call a witness who had allegedly purchased crack from the defendant some years earlier. *Id.* at 821-22. The government sought to introduce this evidence to prove the defendant's knowledge and intent, *id.* at 821, and the district court ultimately allowed the testimony, *id.* at 823. On appeal, this court affirmed. *Id.* at 830. Because the defense had been "based on [the defendant's] claim that he did not know what was in the bag," the witness's testimony as to the

earlier drug sales "obviously had probative value." *Id.* Indeed, even though the witness testified to events remote in time, "[b]ecause one of [the defendant]'s defenses was that he simply did not know that the bag contained cocaine, the district court properly decided that even eight-year-old drug sales were probative as to whether [the defendant] could identify the contents of the bag." *Id.* Accordingly, the district court had "properly concluded that such prior drug sales were probative on the issue of whether [the defendant] knew that the clear plastic bag found in his possession contained cocaine, as well as on the issue of whether [the defendant] intended to distribute the drug." *Id.* The *Matthews* panel did not further analyze the probative value of the prior drug sales vis-a-vis the defendant's intent. Because the government in *Matthews* used the "other acts" evidence primarily to prove knowledge and to refute the specific defense presented, the *Matthews* case is distinguishable from the case at hand.

Even assuming, though, that Freeman's prior conviction is probative of his specific intent, the conviction's probative value is greatly overshadowed by its potential for unfair prejudice. *See United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010) (describing the prejudicial effect of a prior conviction as "Kong-like" under similar circumstances). We recognize that "[t]he district court has broad discretion in balancing probative value against potential prejudicial impact" under Federal Rule of Evidence 403. *Ismail*, 756 F.2d at 1259; *see Bell*, 516 F.3d at 445. However, a district court "weighing the probative value of other acts evidence" should consider "the government's alternative sources of proving intent." *Bell*, 516 F.3d at 445; *see Jenkins*, 593 F.3d at 485-86. In the instant case, the sheer volume and street value of the drugs suggests that whoever possessed them intended

to distribute them. *See Bell*, 516 F.3d at 446. This alternative evidence of intent diminished the Government's need to introduce Freeman's prior conviction at trial. *See Haywood*, 280 F.3d at 723.

On the other side of the scale, the prior conviction "unquestionably ha[d] a powerful and prejudicial impact" on the jury. *Johnson*, 27 F.3d at 1193. "When prior acts evidence is introduced, regardless of the stated purpose, the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered[:] to suggest that the defendant is a bad person, a convicted criminal, and that if he 'did it before he probably did it again.'" *Id.* In light of the limited probative value—if any—of the prior conviction, the availability of other evidence of intent, and the substantial likelihood that the jury viewed the conviction as proof of a propensity to distribute drugs, it was an abuse of discretion to admit the prior conviction into evidence. *See Haywood*, 280 F.3d at 720, 723; *Allen*, 2010 WL 3419506, at *3 (both setting forth the standard of review). Even though the district court gave a limiting instruction, that instruction was not "a sure-fire panacea for the prejudice resulting from the needless admission of such evidence." *Haywood*, 280 F.3d at 724.

The improper admission of Freeman's prior conviction, moreover, was reversible error. The district court's erroneous admission of "other acts" evidence is "reversible unless we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). An assessment of "[w]hether the jury was 'substantially swayed' by the improper admission of ['other acts'] evidence . . . generally depends on whether the properly admissible evidence of the defendant's guilt was overwhelming." *Id.* Although the sheer

volume and street value of the drugs in this case provided highly persuasive, if not overwhelming, evidence of an intent to distribute, the evidence of Freeman's possession, relative to Russell, is fairly weak.[2] "[T]his was, after all, a case of only constructive possession." *Jenkins*, 593 F.3d at 486. Absent evidence of Freeman's prior conviction, the jury may have believed that he did not know about the drugs. Indeed, it is certainly possible that Russell put the drugs in the car during the twenty or so minutes when he borrowed it from Freeman. In light of the presumption that favors reversal, and because we cannot say that the jury was not substantially swayed, it was reversible error to admit Freeman's prior conviction into evidence.[3]

Freeman also attacks the district court's jury instruction on the use of his prior conviction for impeachment purposes. Because Freeman's convictions are reversed on other grounds, we do not reach the impeachment issue.

**C. Admission of Evidence of the July 2006 Incident.**

Both Freeman and Russell challenge the district court's admission of evidence, again pursuant to Rule 404(b), that they had reported the theft of thousands of dollars in cash from their Johnson City, Tennessee, hotel room roughly six months before their arrests in this case. The district court properly admitted the evidence, which supported an inference that the defendants had

---

[2]The district court, in denying the defendants' motions for judgments of acquittal, did note, however, that "the proof is less convincing, less overwhelming with respect to Mr. Russell than it is to Mr. Freeman, especially on the issue of whether or not he knowingly possessed the, the drugs in question here."

[3]One might argue that if the erroneous admission of Freeman's prior conviction infected the jury's verdict as to him, then that same error also infected the jury's verdict as to Russell. However, Russell does not advance that argument on appeal and, therefore, we need not decide the issue.

previously trafficked in drugs in eastern Tennessee. The district court, moreover, properly instructed the jury to consider the evidence only as it related to the defendants' intent.

The district court did not clearly err in finding that the Government had presented sufficient evidence that the July 2006 incident had occurred. *See Matthews*, 440 F.3d at 828 (setting forth the standard of review). When the government seeks the admission of "other acts" evidence pursuant to Rule 404(b), "the government is not required to demonstrate [for the court] that the other acts occurred by a preponderance of the evidence." *Bell*, 516 F.3d at 441. However, "'similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *Id.* (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). By presenting the testimony of Officers McCurry and Edwards, the Government put forth sufficient evidence for the jury to conclude that the July 2006 incident had occurred. Based on evidence that (1) the defendants had kept thousands of dollars in cash in a hotel room; (2) a drug dog had alerted on the money, albeit at a different location; and (3) each defendant had claimed half of the recovered sum of more than $14,000, the jury could have reasonably inferred that the defendants, together, had recently trafficked in drugs.

The Government's evidence of the July 2006 incident is probative of a material issue other than character. The Government offered this evidence to prove Freeman and Russell's intent to distribute narcotics—a proper purpose for the admission of "other acts" evidence under Rule 404(b). *Haywood*, 280 F.3d at 721; *see also Bell*, 516 F.3d at 442. Because both Freeman and Russell pleaded not guilty to the charged offenses, their intent is "in issue" and the Government therefore must prove their intent beyond a reasonable doubt. *See Johnson*, 27 F.3d at 1192. Finally, the

Government's evidence is probative of intent because, in July 2006, the defendants engaged in "conduct that [wa]s 'substantially similar and reasonably near in time' to the specific intent offense[s] at issue" here. *Haywood*, 280 F.3d at 721 (quoting *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)). As mentioned, the July 2006 incident occurred just months before, and geographically near to where, Freeman and Russell were arrested in connection with this case. In addition, in July 2006, a drug dog alerted on the thousands of dollars in cash that the defendants had reported stolen, suggesting that the money had recently been in close proximity to narcotics. Just six months later, in January 2007, local law-enforcement authorities discovered a stash of narcotics, worth $20,000, hidden in the defendants' rental car. Most importantly, Freeman and Russell were traveling together both when they reported the theft from their hotel room in July 2006 and when they were stopped for speeding in January 2007. Accordingly, because the July 2006 incident occurred reasonably near in time and involved conduct substantially similar to the conduct at issue here, evidence of the July 2006 incident is probative of the defendants' intent to distribute narcotics. Indeed, evidence suggesting that Freeman and Russell had previously collaborated to sell drugs goes directly to the question of whether either defendant was innocently in the presence of the other's drug-sale activity when their rental car was stopped in January 2007.

Having properly concluded that evidence of the July 2006 incident was probative of the defendants' intent to distribute narcotics, the district court further determined that the evidence was "not unduly prejudicial when you do the [Rule] 403 balancing test." The district court, moreover, gave the jury appropriate limiting instructions as to the use of the evidence, both immediately after the Government had presented its evidence and after the close of all evidence at trial. *See United*

*States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996). Because neither Freeman nor Russell makes a persuasive argument on appeal as to why the July 2006 incident's probative value is substantially outweighed by a risk of unfair prejudice, there is no basis to conclude that the district court abused its discretion in admitting this "other acts" evidence. *See Bell*, 516 F.3d at 445 (noting the "highly discretionary nature of th[e] balancing process").

**D. Sufficiency of the Evidence to Convict Russell.**

Although the evidence against Russell is not overwhelming, it does support a guilty verdict on each count. Russell's sufficiency of the evidence argument appears to focus on the jury's finding that he "knowingly possessed" the narcotics found in the rental car. The Government, relying on a theory of constructive (rather than actual) possession, put forth sufficient evidence to support the jury's finding. "[C]onstructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Hunter*, 558 F.3d 495, 504 (6th Cir. 2009); *see also United States v. Bailey*, 553 F.3d 940, 944-45 (6th Cir. 2009) (noting "that the theory of constructive possession requires 'specific intent'"). "Physical proximity to drugs, or mere presence in an area where drugs are found, is not sufficient" to support a finding of possession. *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991).

The evidence in this case allows the inference that Russell was not merely physically present in the rental car, but rather knew that he had the power—and, in fact, intended at some point—to exercise dominion and control over the contraband. In deciding claims such as this one, the court considers "the evidence in the light most favorable to the prosecution to determine whether any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). At trial, both Trooper Lunceford and Officer Wigand testified that the narcotics had been concealed at the rear center of the vehicle's headliner. This testimony, viewed in the light most favorable to the Government, suggests that both Freeman, the driver, and Russell, in the front passenger seat, had access to the drugs. Trooper Lunceford further testified that both Freeman and Russell had spontaneously put "their hands up in the air" when he had stopped their vehicle; that gesture is "nothing [he] see[s] normally on a routine traffic stop." The jury could infer, then, that both Freeman and Russell had guilty knowledge of the presence of the narcotics at that time. Russell himself testified that he had borrowed the rental car for twenty to twenty-five minutes to drive to his girlfriend's house while Freeman had rented a hotel room. This testimony provided a basis for the jury to infer that Russell, not Freeman, had put the drugs in the vehicle's headliner. Even if the jury concluded that Freeman had hidden the drugs sometime earlier in the day, the jury could infer from Freeman's entrusting the car to Russell that Freeman and Russell were working together to possess and distribute the drugs. Finally, the Government presented evidence that, after police had recovered more than $14,000 from a hotel maid in July 2006, Freeman and Russell had each claimed half of the money. The jury could infer from this evidence that Freeman and Russell had shared the proceeds of drug distribution previously and that they had intended to do so again, before they were apprehended. This was sufficient for the jury to find that Russell had developed the specific intent to exercise dominion and control over the contraband, as required to establish constructive possession. *See Bailey*, 553 F.3d at 944-45.

The Government presented additional evidence that Freeman and Russell had intended to distribute the drugs. Most notably, the sheer volume of drugs suggests an intent to distribute. Indeed, one of the Government's witnesses estimated that the drugs had a street value of $20,000.

Although the evidence against Russell is circumstantial, on the whole, and when viewed in the light most favorable to the Government, the evidence is sufficient to sustain his convictions. *See United States v. Welch*, 97 F.3d 142, 150-51 (6th Cir. 1996).

**III.**

Although we affirm as to Russell, we reverse Freeman's convictions because it was error to admit evidence of his prior drug-trafficking conviction to prove his intent to distribute narcotics. We therefore vacate Freeman's sentence and remand to the district court for proceedings consistent with this opinion.